**BURSOR & FISHER, P.A.**
Philip L. Fraietta (State Bar No. 354768)
50 Main St., Ste. 475
White Plains, NY 10606
Telephone: (914) 874-0710
Facsimile: (914) 206-3656
E-mail: pfraietta@bursor.com

**BURSOR & FISHER, P.A.**
Joshua R. Wilner (State Bar No. 353949)
1990 North California Blvd., 9th Floor
Walnut Creek, CA 94596
Telephone: (925) 300-4455
Facsimile: (925) 407-2700
E-mail: jwilner@bursor.com

**BURSOR & FISHER, P.A.**
Max S. Roberts (State Bar No. 363482)
1330 Avenue of the Americas, 32nd Floor
New York, NY 10069
Telephone: (646) 837-7150
Facsimile: (212) 989-9163
E-mail: mroberts@bursor.com

*Attorneys for Plaintiff*

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| CHRISTIAN CALCINES, individually and on behalf of all others similarly situated, <br><br> Plaintiff, <br><br> v. <br><br> PINTEREST, INC., <br><br> Defendant. | Case No.  2:26-cv-2154 <br><br> **CLASS ACTION COMPLAINT** <br><br> **JURY TRIAL DEMANDED** |

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

# TABLE OF CONTENTS

**PAGE**

NATURE OF THE ACTION ............................................................................. 1

THE PARTIES ................................................................................................. 1

JURISDICTION AND VENUE ........................................................................ 2

FACTUAL ALLEGATIONS ............................................................................ 2

I.    PINTEREST ........................................................................................... 2

II.   PINTEREST'S ONLINE TRACKING TECHNOLOGY .............................. 5

    A.    Persistent Identifiers........................................................................ 7

        1.    IP Addresses ..................................................................... 8

        2.    Mobile Advertising Identifiers ....................................... 13

        3.    Email Addresses and Other Addressing Information ................. 20

    B.    Interception of Communications........................................ 22

III.  PINTEREST'S ADVERTISING PRODUCTS .......................................... 23

    A.    Pinterest Business ......................................................... 23

    B.    Identity Resolution ...................................................... 25

    C.    Information Shared Outside of Pinterest's Ad Network...................... 27

IV.   DEFENDANT'S TRACKERS ARE PRESENT ON EACH OF THE SUBJECT WEBSITES AND ACROSS THE INTERNET.......................... 28

    A.    Zillow ....................................................................... 29

    B.    Western Union ........................................................... 30

V.    PLAINTIFF'S EXPERIENCE ........................................................... 32

CLASS ALLEGATIONS ............................................................................. 33

CAUSES OF ACTION ................................................................................ 35

    COUNT I ...................................................................................... 35

    COUNT II...................................................................................... 37

COUNT III ......................................................................................... 41

COUNT IV ........................................................................................ 42

COUNT V .......................................................................................... 45

COUNT VI ........................................................................................ 47

PRAYER FOR RELIEF ........................................................................ 50

JURY TRIAL DEMANDED .................................................................. 50

Plaintiff Christian Calcines ("Plaintiff") brings this action on behalf of himself and all others similarly situated against Pinterest, Inc. ("Pinterest" or "Defendant"). Plaintiff makes the following allegations pursuant to the investigation of his counsel and based upon information and belief, except as to the allegation specifically pertaining to himself, which are based on personal belief.

## NATURE OF THE ACTION

1. This class action lawsuit sets forth how Pinterest surveils of millions of Americans, through their activity on the Internet and mobile applications. Pinterest, through its software products, tracks in real time and records indefinitely non-anonymous personal information and specific web activity of hundreds of millions of Americans.

2. Pinterest collects this information to identify users of the Pinterest social media platform and serve them with advertisements based on their activity off the platform and, in doing so, connects intimate details about their person and behavior to an individual's email address and phone number. This, on its own, is invasive enough, but Pinterest also collects and stores the information of millions of people.

3. This unlawfully collected information is worth billions of dollars to Defendant because it fuels the advertising machine on Pinterest, at the expense of Americans' privacy.

4. Plaintiff brings this action to enforce their constitutional rights to privacy and to seek damages under Federal and California law for the harm caused by the collection and sale of their confidential data and personal information.

## THE PARTIES

5. Plaintiff Christian Calcines is a natural person and citizen of California, residing in Thousand Oaks, California. While in California, Plaintiff Calcines visited numerous websites where Pinterest's tracking technology was present and had his activity on those websites and subsequent activity on other websites tracked by Defendant.

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED                    1

6. Defendant Pinterest, Inc. is a Delaware corporation with its principal place of business at 651 Brannan Street 94107. Pinterest, Inc. owns and operates the Pinterest Tag and the Pinterest social media platform, including its advertising service.

## JURISDICTION AND VENUE

7. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(d)(2)(A) because this case is a class action where the aggregate claims of all members of the proposed class are in excess of $5,000,000, exclusive of interest and costs, and at least one member of the proposed class is a citizen of a state different from at least one Defendant.

8. This has personal jurisdiction over Defendant because Defendant collected the private information of thousands or millions of people in California, sold that information to advertisers in California—who targeted advertisements to Californians based in part on their location in California—and profited from the sale of Californians' personal information. Further, Defendant's principal places of business are in California.

9. Venue is proper in this District pursuant to 28 U.S.C. § 1391 because a substantial part of the events giving rise to the claim occurred in this District, Plaintiff resides in this District, and Defendant resides in this District.

## FACTUAL ALLEGATIONS

### I. PINTEREST

10. Founded in 2010, Defendant Pinterest is an online and mobile "social-bookmarking platform that allows users to upload and share images, known as 'pins,' from around the web."[1] "Users group their images into typically themed collections called "pinboards," which act as content catalogues."[2]

---

[1] *Pinterest*, EBSCO, https://www.ebsco.com/research-starters/business-and-management/pinterest (last accessed Feb. 10, 2026).
[2] *Id*.

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED                    2

11. Currently, Pinterest is one of the largest social media platforms in the world, with over 600 million monthly active users worldwide.[3] It is available through a desktop browser ("the Website"), but also as a mobile application ("the App").

12. Pinterest allows users to browse "for inspiration. As people scroll, they gather ideas for what to try next. The more they use Pinterest, their personalized recommendations get better and better. Our visual search technology helps people discover new ideas and define their tastes, even if they don't have words to express what they want."[4]

13. Central features of the Pinterest platform include its "home feed" and the "explore page." Both the home feed and the explore page are "infinite scrolls," meaning that users can access more content simply by continuing to browse a single page or screen.

14. Pinterest users can browse the Website and App with or without creating an account.

15. Pinterest users or visitors are served ads while they use the app.

16. Like nearly all social media platforms, access to Pinterest is free. This is because it makes its money elsewhere: through advertising and monetization. For the twelve months ending in September 30, 2025, Pinterest made $4.057B.[5]

17. Pinterest's aggressive push for advertising and monetization has paid off. "Pinterest has been reshaping itself as a performance marketing platform for the past few years, CEO Bill Ready told investors during the company's Q4 earnings

---

[3] *Your audience is here. And they're ready to shop.*, PINTEREST, https://business.pinterest.com/audience/ (last accessed Feb. 10, 2026).
[4] *How Pinterest works*, PINTEREST, https://business.pinterest.com/how-pinterest-works/ (last accessed Feb. 10, 2026).
[5] *Pinterest Revenue 2018-2025 | PINS*, MACROTRENDS, https://www.macrotrends.net/stocks/charts/PINS/pinterest/revenue (last accessed Feb. 10, 2026).

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED 3

call Thursday […] Pinterest reported $1.2 billion in Q4 revenue, an 18% year over year increase – and its first-ever billion-dollar quarter."[6]

18.    Pinterest admits that it monitors and collects user information to boost its advertising capabilities. Pinterest says that "[t]o help you see ads you're more likely to be interested in, Pinterest or a company advertising on Pinterest may use information about your off-Pinterest activity to personalize the ads you see."[7]

19.    Pinterest also uses first-party and third-party cookies for advertising purposes. Pinterest says it "use[s] cookies to help advertisers understand who sees and interacts with their ads, and who visits their website or purchases their products."[8]

20.    Pinterest "may also use cookies to help an advertising service we partner with show you interesting ads. For example, if you bought a tent from an advertiser that uses a Pinterest partner's service, they could ask us to show you an ad for a camping stove."[9]

21.    Moreover, Pinterest "hire[s] advertising vendors so that we can market Pinterest products on other websites and apps. These providers may use cookies to provide this service to us."[10]

22.    Pinterest also admits that "[o]nline advertisers or third parties provide information to us about you to measure, report on or improve the performance of ads on Pinterest, or to help us better understand what kinds of ads to show you on Pinterest. For example, we may receive information about your visits to an

---

[6] *Pinterest's Performance Play Pays Off,* AD EXCHANGER, https://www.adexchanger.com/platforms/pinterests-performance-play-pays-off/ (Feb. 6, 2025).

[7] *Personalized ads on Pinterest*, PINTEREST, https://help.pinterest.com/en/article/personalized-ads-on-pinterest (last accessed Feb. 10, 2026).

[8] *Cookies*, PINTEREST, https://policy.pinterest.com/en/cookies (last updated Jul. 1, 2021).

[9] *Id*.

[10] *Id*.

---

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED                    4

advertiser's site, or purchases you made from them, or information about your interests from a third-party service, which we might use to help show you ads on the Service. Sometimes we get this information through the Pinterest Tag (a piece of code an advertiser puts on their site), which delivers insights to us and our ad partners about actions that a person takes on their website after viewing an ad on our Services."[11]

23.    The impact of Pinterest's surveillance of user behavior is evident all over its platform. Each user's home feed and explore pages—which contains organic content—also contains numerous personalized advertisements for products.

## II.    PINTEREST'S ONLINE TRACKING TECHNOLOGY

24.    The Pinterest Tag is a piece of code that "delivers insights to us and our ad partners about actions that a person takes on their website after viewing an ad on" Pinterest.[12] Advertisers can "use a Pinterest tag on their website, or send us information from their mobile app, to help us understand who's visited or made purchases on their site or app. We can use that information to show ads to the right people on Pinterest."[13]

25.    The Pinterest Tag facilitates Pinterest's ability to advertise to its users on "other sites and apps." It does this by disclosing "information such as cookie IDs, your IP address, or a hashed version of your email address to third parties, such as Facebook Ads, Google Marketing Platform, and others who may combine that information with other information they already have about you and deliver ads about Pinterest to you."[14]

---

[11] *Id.*

[12] *Privacy Policy*, PINTEREST, https://policy.pinterest.com/en/privacy-policy (last updated Apr. 30, 2025)

[13] *Personalization and data*, PINTEREST, https://help.pinterest.com/en/article/personalization-and-data (last accessed Feb. 17, 2026).

[14] *Privacy Policy*, PINTEREST, https://policy.pinterest.com/en/privacy-policy (last updated Apr. 30, 2025)

26.    The Pinterest Tag enhances Pinterest's ad tracking by collecting, combining and transmitting user information to third parties. Pinterest thus aggregates a multilayered picture of a users' online activity to better targeting advertising to users on and off the Pinterest Website or App.

27.    In other words, the Pinterest Tag is a piece of code that Pinterest clients implement on their website to track their users' website behavior. The Pinterest Tag then transmits that user behavior data back to Pinterest in order to better target users for advertising.

28.    The Pinterest Conversions API (application programming interface) allows Pinterest Business customers to access a "tagless and cookieless server-to-server solution that builds a bridge between your website, app and even offline sales—directly to Pinterest's powerful analytics engine. It helps protect user privacy and lets you understand the complete customer journey, from initial inspiration all the way through to checkout."[15] The Pinterest Conversions API allows Pinterest Business customers to "[p]ass web, app and offline data through the API. You can see how your marketing dollars on Pinterest are driving results across channels."[16]

29.    The Pinterest Conversions API, in other words, further allows Pinterest Business clients to integrate and share their data with Pinterest to boost their targeted advertising capabilities.

30.    For Pinterest Business clients, the benefits of utilizing the Pinterest Conversions API and Pinterest Tag include improved "better tracking and insights into your conversions impact."[17]

---

[15] *Cookies crumble. The Pinterest Conversions API sticks.*, PINTEREST, https://business.pinterest.com/blog/cookies-crumble-pinterest-api-for-conversions/ (last accessed Feb. 2026)

[16] *More visibility for smarter campaigns*, PINTEREST, https://business.pinterest.com/capi/ (last accessed Feb. 2026)

[17] *Id.*

31.    The Pinterest Tag and Pinterest Conversions API are marketing/advertising solutions that allow Pinterest to identify, survey, and categorize users by combining Pinterest Business clients' data with Pinterest's own data. In this way, Pinterest augments its own data set, and adds to or creates profiles of users for the sake of advertising.

### A.    Persistent Identifiers

32.    One way that Pinterest tracks individuals across multiple websites is through the use of persistent identifiers.  As the name suggests, persistent identifiers are identifying information that follows an Internet user from one website or app to another. Pinterest uses these identifiers to confirm that a visitor using a particular website is the same person identified by Pinterest on its Website or App.

33.    One form of persistent identifier is a browser "cookie."  "Cookies are bits of data that are sent to and from your browser to identify you.  When you open a website, your browser sends a piece of data to the web server hosting that website."[18]

34.    Pinterest uses several cookies to track users' activities across the internet.

35.    Upon information and belief, Pinterest uses other cookies for advertising purposes, including to make ads "more relevant and meaningful to users, and to track the efficiency of our advertising campaigns, both on our services and on other sites or mobile apps. Our third-party advertising partners may use these cookies to build a profile of your interests and deliver relevant advertising on other sites."[19]

36.    Pinterest explains that cookies—including their cookies—are small text files that sites store on users' computer "so that a site like Pinterest can remember

---

[18] https://www.microsoft.com/en-us/edge/learning-center/what-are-cookies?form=MA13I2 (last visited Dec. 23, 2024).

[19] *Id.*

information about your visit and can use the information to improve your experience and to create aggregated anonymized statistics about usage of the site."[20]

37. When a user visits a website that utilizes Pinterest's Pixel, the Pinterest Ads client requests that Pinterest set a cookie onto the browser or device of the person visiting the website. Pinterest then links these proprietary ID numbers to the

_pinterest_ct_ua
TWc9PSZ4bmxLSXoySzFQQUpudlc4Qkl3ZitUUHEvMkhOTEJNK05WR0VoQTY2Y2dOYkVQTlhha
mVEMTA3djJzeWhHTys5MHBPVk9hbEY2cENDNEgzQ2h3NzF2V3g5VmxrRXZUeExMQlJLM2kvV
FRSdz0mTHM1aW1HcEtZQ0F3NkNrVjdGdGNaRkVsQkhnPQ==

cookie and the individual with the cookie:

38. After the cookie is loaded onto a person's browser, each time that person visits a website where the Pinterest Tag is operating, Pinterest uses the cookie to identify the website visitor as the same person who visited previous websites with the same cookie installed on their browser, and thereafter matches it to a user of the Pinterest Website or App. As such, Pinterest is able to track each individual Website and/or App user across multiple sites to create a more detailed profile on that person's beliefs, interests, and habits.

39. This information is cross-referenced with other information collected by Pinterest to specifically identify the individual using the device and to add this web-activity information to a larger profile on the individual to sell their profile for targeted advertising.

1. *IP Addresses*

40. Pinterest says that it collects information from users, including their IP addresses.

41. IP addresses are another common persistent identifier.

42. An IP address is a unique set of numbers assigned to a device on a network, which is typically expressed as four sets of numbers separated by periods

---

[20] *Id.*

(*e.g.*, 192.168.123.132).  The traditional format of IP addresses is called IPv4, and it has a finite amount of combinations and thus is limited to approximately 4.3 billion addresses.  Because this proved to be insufficient as the Internet grew, IPv6 was introduced.  IPv6 offers a vastly larger address space with 340 undecillion possible addresses.  While IPv6 adoption has been increasing, many networks still rely on IPv4.[21]

43.    Much like a telephone number, an IP address guides or routes an intentional communication signal (*i.e.*, a data packet) from one device to another.  An IP address is essential for identifying a device on the internet or within a local network, facilitating smooth communication between devices.

44.    IP addresses are not freely accessible.  If an individual is not actively sending data packets out, their IP address remains private and is not broadcast to the wider internet.

45.    IP addresses can be used to determine the approximate physical location of a device.  For example, services like iplocation.io use databases that map IP addresses to geographic areas—often providing information about the country, city, approximate latitude and longitude coordinates, or even the internet service provider associated with the public IP.[22]  Thus, knowing a user's public IP address—and therefore geographical location—"provide[s] a level of specificity previously unfound in marketing."[23]

---

[21]  *See, e.g.*, https://www.cloudflare.com/learning/network-layer/internet-protocol/ (last visited Dec. 23, 2024); https://netbeez.net/blog/rfc1918/ (last visited Dec. 23, 2024).

[22] https://iplocation.io/ (last visited Dec. 23, 2024).

[23] *IP Targeting: Understanding This Essential Marketing Tool*, ACCUDATA (Nov. 20, 2023), https://www.accudata.com/blog/ip-targeting/.

---

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED                                    9

46.     An IP address allows advertisers to (i) "[t]arget [customers by] countries, cities, neighborhoods, and … postal code"[24] and (ii) "to target specific households, businesses[,] and even individuals with ads that are relevant to their interests."[25]  Indeed, "IP targeting is one of the most targeted marketing techniques [companies] can employ to spread the word about [a] product or service"[26] because "[c]ompanies can use an IP address … to personally identify individuals."[27]

47.     In fact, an IP address is a common identifier used for "geomarketing," which is "the practice of using location data to identify and serve marketing messages to a highly-targeted audience.  Essentially, geomarketing allows [websites] to better serve [their] audience by giving [them] an inside look into where they are, where they have been, and what kinds of products or services will appeal to their needs."[28]  For example, for a job fair in specific city, companies can send advertisements to only those in the general location of the upcoming event.[29]

48.     "IP targeting is a highly effective digital advertising technique that allows you to deliver ads to specific physical addresses based on their internet protocol (IP) address. IP targeting technology works by matching physical addresses

---

[24] *Location-Based Targeting That Puts You in Control*, CHOOZLE, https://choozle.com/geotargeting-strategies/.

[25] Herbert Williams, *The Benefits of IP Address Targeting for Local Businesses*, LINKEDIN (Nov. 29, 2023), https://www.linkedin.com/pulse/benefits-ip-address-targeting-local-businesses-herbert williams-z7bhf.

[26] *IP Targeting: Understanding This Essential Marketing Tool*, ACCUDATA (Nov. 20, 2023), https://www.accudata.com/blog/ip-targeting/.

[27] Trey Titone, *The Future Of IP Address As An Advertising Identifier*, AD TECH EXPLAINED (May 16, 2022), https://adtechexplained.com/the-future-of-ip-address-as-an-advertising-identifier/.

[28] *See*, *e.g.*, *The Essential Guide to Geomarketing: Strategies, Tips & More*, DEEP SYNC (Nov. 20, 2023), https://deepsync.com/geomarketing/.

[29] *See*, *e.g.*, *Personalize Your Website And Digital Marketing Using IP Address*, GEOFLI, https://geofli.com/blog/how-to-use-ip-address-data-to-personalize-your-website-and-digital-marketing-campaigns.

---

to IP addresses, allowing advertisers to serve ads to specific households or businesses based on their location."[30]

49.    "IP targeting capabilities are highly precise, with an accuracy rate of over 95%. This means that advertisers can deliver highly targeted ads to specific households or businesses, rather than relying on more general demographics or behavioral data."[31]

50.    In addition to "reach[ing] their target audience with greater precision," businesses are incentivized to use a customer's IP address because it "can be more cost-effective than other forms of advertising."[32]  "By targeting specific households or businesses, businesses can avoid wasting money on ads that are unlikely to be seen by their target audience."[33]

51.    In addition, "IP address targeting can help businesses to improve their overall marketing strategy."[34]  "By analyzing data on which households or businesses are responding to their ads, businesses can refine their targeting strategy and improve their overall marketing efforts."[35]

52.    Putting IP addresses in the hands of a companies like Pinterest is particularly invasive, as the NATO report noted:

> [a] data broker may receive information about a[] [website] user, including his … IP address.  The user then opens the [website] while his phone is connected to his home Wi-Fi network.  When this happens, the data broker can use the IP address of the home network

---

[30] *IP Targeting*, SAVANT DSP, https://www.savantdsp.com/ip-targeting?gad_source=1&gclid=Cj0KCQjw1Yy5BhDARIsAI0RbXZJKJSqMI6p1xAxyqai1WhAiXRJTbX8qYhNuEvIfSCJ4jfOV5-5maUaAgtNEALw_wcB.

[31] *Id.*

[32] Williams, https://www.linkedin.com/pulse/benefits-ip-address-targeting-local-businesses-herbert-williams-z7bhf.

[33] *Id.*

[34] *Id.*

[35] *Id.*

to identify the user's home, and append this to the unique profile it is compiling about the user. If the user has a computer connected to the same network, this computer will have the same IP address. The data broker can then use the IP address to connect the computer to the same user, and identify that user when their IP address makes requests on other publisher pages within their ad network. Now the data broker knows that the same individual is using both the phone and the computer, which allows it to track behavior across devices and target the user and their devices with ads on different networks.[36]

53. Indeed, as McAfee (a data security company) notes, "data brokers can … even place trackers or cookies on your browsers … [that] track your IP address and browsing history, which third parties can exploit."[37]

54. In other words, not only does the collection of IP addresses by Defendant cause harm in and of itself, the Defendant specifically attaches IP addresses to comprehensive user profiles, tracking Plaintiff and Class Members across the Internet using their IP addresses in conjunction with other data and compiling vast reams of other personal information in the process.

55. For these reasons, under Europe's General Data Protection Regulation, IP addresses are considered "personal data, as they can potentially be used to identify an individual."[38]

56. Likewise, under the California Consumer Privacy Act, IP addresses are considered "personal information" because they are "reasonably capable of being

---

[36] TWETMAN & BERGMANIS-KORATS, *supra* at 11.

[37] Jasdev Dhaliwal, *How Data Brokers Sell Your Identity*, MCAFEE (June 4, 2024), https://www.mcafee.com/blogs/tips-tricks/how-data-brokers-sell-your-identity/.

[38] IS AN IP ADDRESS PERSONAL DATA?, CONVESIO, https://convesio.com/knowledgebase/article/is-an-ip-address-personal-data/; *see also* WHAT IS PERSONAL DATA?, EUROPEAN COMMISSION, https://commission.europa.eu/law/law-topic/data-protection/reform/what-personal-data_en.

associated with, or could reasonably be linked, directly or indirectly, with a particular consumer or household."  Cal. Civ. Code § 1798.140(v)(1)(A).[39]

### 2. Mobile Advertising Identifiers

57.    Pinterest employs similar methods to track individuals using mobile apps on Android and iOS devices.

58.    Pinterest owns and operates "software development kits" (SDKs), pieces of code that work independently or with "application programming interfaces" (APIs) and are loaded into mobile apps and can track users' activity on certain apps.[40]

59.    An SDK is a "set of tools for developers that offers building blocks for the creation of an application instead of developers starting from scratch … For example, Google Analytics provides an SDK that gives insight into user behavior, engagement, and cross-network attribution."[41]

60.    An API "acts an intermediary layer that processes data transfer between systems, letting companies open their application data and functionality to external third-party developers [and] business partners."[42]  An API can "work[] as a standalone solution or included within an SDK … [A]n SDK often contains at least one API."[43]  APIs "enable[] companies to open up their applications' [or websites']

---

[39] A "consumer" is defined as "a natural person who is a California resident."  Cal. Civ. Code § 1798.140(i).)  A "household" is defined as "a group … of consumers who cohabitate with one another at the same residential address and share use of common devices or services."  Cal. Civ. Code § 1798.140(1).)

[40] https://www.ibm.com/blog/sdk-vs-api/ ("SDK" stands for software development kit and "is a set of software-building tools for a specific program," while "API" stands for application programming interface) (last visited Dec. 23, 2024).

[41] API VS. SDK: THE DIFFERENCE EXPLAINED (WITH EXAMPLES), https://getstream.io/glossary/api-vs-sdk/.

[42] IBM, *What is an API?*, available https://www.ibm.com/topics/api.

[43] SDK VS. API: WHAT'S THE DIFFERENCE?, IBM (July 13, 2011), https://www.ibm.com/blog/sdk-vs-api/ ("SDK" stands for software development kit and "is a set of software-building tools for a specific program," while "API" stands for application programming interface).

---

data and functionality to external third-party developers, business partners, and internal departments within their companies."[44]

61.     Pinterest explains that Pinterest Business clients can set up device targeting that "helps you get your ad in front of people using specific devices to browse Pinterest. You can choose to target your ad to people on one or multiple different devices." Pinterest allows targeting of "[p]eople browsing Pinterest using the app on an Android mobile device" and "[p]eople browsing Pinterest using the app on an iPhone mobile device."[45] Pinterest encourages Pinterest Business users to "upload existing customers' emails or mobile ad IDs (MAIDs) through a single-column CSV file."[46]

62.     This type of targeting is part of what Pinterest calls "audience targeting." Audience targeting "helps you reach a specific group of people by combining information about your customers with information about how people use Pinterest. You can target a group of people based on site visitors" or specifically target "an uploaded customer list of emails or mobile ad IDs."[47]

63.     This means that Pinterest collects mobile identifiers of Website and App users, combines them with information receives from third parties, and integrates them into its profiles of Website and App users.

64.     For example, Pinterest collects advertising identifiers that are designed to track the App activity of individual users across different apps and websites. Two

---

[44] APPLICATION PROGRAMMING INTERFACE (API), https://www.ibm.com/cloud/learn/api.

[45] *Set up device targeting*, PINTEREST, https://help.pinterest.com/en/business/article/set-up-device-targeting (last accessed Feb. 2026).

[46] *Set up audience targeting*, PINTEREST, https://help.pinterest.com/en/business/article/audience-targeting (last accessed Feb. 2026).

[47] *Id.*

of the most prominent are AAIDs (for Android devices) and IDFAs (for iOS devices) (collectively, "Mobile Advertising IDs" or "MAIDs").

65.    An AAID is a unique string of numbers which attaches to a device.  As the name implies, an AAID is sent to advertisers and other third parties so they can track user activity across multiple mobile applications.[48]  So, for example, if a third party collects AAIDs from two separate mobile applications, it can track, cross-correlate, and aggregate a user's activity on both apps.

66.    Although technically resettable, an AAID is a persistent identifier because virtually no one knows about AAIDs and, correspondingly, virtually no one resets that identifier.  The fact that the use and disclosure of AAIDs is so ubiquitous evinces an understanding on the part of Defendant, Google, and others in the field that they are almost never manually reset by users (or else an AAID would be of no use to advertisers).  Byron Tau, Means of Control: How the Hidden Alliance of Tech and Government is Creating a New American Surveillance State at 175 (2024) ("Like me, most people had no idea about the 'Limit Ad Tracking' menu on their iPhones or the AAID that Google had given even Android devices.  Many still don't."); *see also Louth v. NFL Enterprises LLC*, 2022 WL 4130866, at *3 (D.R.I. Sept. 12, 2022) ("While AAID are resettable by users, the plaintiff plausibly alleges that AAID is a persistent identifier because virtually no one knows about AAIDs and, correspondingly, virtually no one resets their AAID.") (cleaned up).

---

[48] https://support.google.com/googleplay/android-developer/answer/6048248 (last visited Dec. 23, 2024).

67. Using publicly available resources, an AAID can track a user's movements, habits, and activity on mobile applications.[49]  Put together, the AAID serves as "the passport for aggregating all of the data about a user in one place."[50]

68. Because an AAID creates a record of user activity, this data can create inferences about an individual, like a person's political or religious affiliations, sexuality, or general reading and viewing preferences.  These inferences, combined with publicly available tools, make AAIDs an identifier that sufficiently permits an ordinary person to identify a specific individual.

69. Similarly, an "Identifier for Advertisers, or IDFA for short, is a unique, random identifier (device ID) that Apple assigns to every iOS device. An IDFA would be the equivalent of a web cookie, in the sense that it enables advertisers to monitor users' engagement with their ads, and keep track of their post-install activity."[51]

70. As with the Pinterest Tag and collection of AAIDs, Pinterest's collection of IDFAs allows Pinterest to track iOS users' activity across the various apps they use. Like the AAID, this data can create inferences about an individual, such as a person's political or religious affiliations, sexuality, or general reading and viewing preferences.  These inferences, combined with publicly available tools, sufficiently permits even an ordinary person to identify a specific individual with the IDFA.

71. Regardless of whether these IDs are supposed to be anonymous, MAIDs are often combined with other identifiers to identify users in what is known as ID Bridging. "ID Bridging" is the process of "piecing together different bits of

[49]https://www.huffingtonpost.co.uk/entry/using-just-1000-worth-of-mobile-adverts-you-can-effectively-track-anyone_uk_59e87ccbe4b0d0e4fe6d6be5 (last visited Dec. 23, 2024).

[50] https://digitalwatchdog.org/trend-report-apps-oversharing-your-advertising-id/ (last visited Dec. 23, 2024).

[51]https://www.appsflyer.com/glossary/idfa/ (last visited Dec. 23, 2024).

information about" a user "to confidently infer that it is the same individual accessing a publisher's site or sites from various devices or browsers."[52] That is, users can be identified and tracked by "bridging" (or linking) their MAIDs to other sources, such as e-mail addresses, geolocation, or phone numbers.



72. ID Bridging "has long been the foundation of programmatic advertising,"[53] which is the process by which companies "use [] advertising technology to buy and sell digital ads" by "serv[ing] up relevant ad impressions to audiences through automated steps, in less than a second."[54] It entails a "unique identifier[] assigned to individual devices," including "Google's Advertising ID," personal information like geolocation and e-mail address, and "cross-platform linkage."[55]

---

[52] Kayleigh Barber, *WTF Is The Difference Between Id Bridging And Id Spoofing?*, DIGIDAY (July 8, 2024, https://digiday.com/media/wtf-is-the-difference-between-id-bridging-and-id-spoofing/.

[53] https://www.adexchanger.com/data-driven-thinking/how-can-id-bridging-the-foundation-of-our-space-suddenly-be-a-bad-thing/.

[54] PROGRAMMATIC ADVERTISING, https://advertising.amazon.com/blog/programmatic-advertising#.

[55] Anete Jodzevica, *ID Bridging: The Privacy-First Future of Audience Targeting*, SETUPAD (Nov. 15, 2024), https://setupad.com/blog/id-bridging/. Ironically, the

---

73. ID Bridging is a money-making machine for advertisers and app developers. On the advertiser side, ID Bridging "increase the chances of an ad buying platform finding their inventory to be addressable and, therefore, maximizes their 'ad yields.'" And on the app developer side, "publishers can boost revenue from direct-sold campaigns by offering advertisers access to more defined and valuable audiences."[56]

74. In other words, advertisers will be able to find users that are more directly and likely interested in what is being sold by having access to significantly more information. And app users' information will be more valuable (and therefore, bring in more money to app developers) because it is combined with a plethora of other information from various sources.

75. Many companies (*e.g.*, data brokers, identity graph providers), publicly advertise their ability to conduct such bridging. And Pinterest itself has touted the benefits of ID Bridging, noting that Pinterest Ads users can engage in "Automatic Advanced Matching." "Auto-advanced matching (AAM) uses customer-provided information to associate them with their conversion activity for better ad metrics. This feature ingests your site to collect relevant match keys," which are "user identifiers that help improve conversion measurement," and can "[i]mprove attribution accuracy and capture more conversions with reliable identifiers, especially email addresses" and "[e]nhance cross-device tracking."[57]

76. This allows Pinterest Business users to match their customer-provided information to Pinterest's collected data for the sake of targeted advertising. Pinterest

---

example given in this article is a "hashed e-mail," where the e-mail Defendant collected in this example is not hashed.

[56] Bennett Crumbling, *What Is 'ID Bridging' And How Publishers Use It To Grow Direct And Programmatic Revenue?*, OPTABLE (Aug. 22, 2024. https://www.optable.co/blog/what-is-id-bridging.

[57] *About Match Keys,* PINTEREST, https://business.Pinteresthelp.com/s/article/about-match-keys (last accessed Feb. 2026)

---

admits that "[s]ome of this information is aggregated. For example, we would report to an advertiser that a certain percentage of people who viewed a Pin went on to visit that advertiser's site. Depending on where you live and your settings, we may also disclose this information at an individual level. For example, we would let an advertiser know that a particular Pin has been saved by certain people."[58]

77. Put simply, Pinterest's audience targeting is facilitated by its use of ID bridging, which enables an advertiser to extend user identification beyond the scope of one browser or device.[59]

78. Yet, while those within the ID Bridging industry describe it as privacy-protective, it is anything but. As courts have noted, the "ability to amass vast amounts of personal data for the purpose of identifying individuals and aggregating their many identifiers" creates "dossiers which can be used to further invade [users] privacy by allowing third parties to learn intimate details of [users'] lives, and target them for advertising, political, and other purposes, ultimately harming them through the abrogation of their autonomy and their ability to control dissemination and use of information about them." *Katz-Lacabe v. Oracle Am., Inc.*, 688 F. Supp. 3d 928, 940 (N.D. Cal. 2023) (cleaned up).

79. In February 2019, Oracle published a paper entitled "Google's Shadow Profile: A Dossier of Consumers Online and Real World Life," part of which provides as accurate a description of Google's services (and Pinterest's, as Defendant):

> a consumer's "shadow profile" [is a] massive, largely hidden dataset[] of online and offline activities. This information is collected through

---

[58] *Privacy Policy*, PINTEREST, https://policy.pinterest.com/en/privacy-policy (last updated Apr. 30, 2025)

[59] *See, e.g.*, Budi Tanzi, *New OpenRTB Specs Ensure Identity Resolution Can Be Done Transparently With Trusted Partners*, EXPERIAN (Dec. 18, 2024), https://www.experian.com/blogs/marketing-forward/new-openrtb-specs-ensure-identity-resolution-can-be-done-transparently-with-trusted-partners/.

---

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED 19

an extensive web of … services, which is difficult, if not impossible to avoid. It is largely collected invisibly and without consumer consent. Processed by algorithms and artificial intelligence, this data reveals an intimate picture of a specific consumer's movements, socio-economics, demographics, "likes", activities and more. It may or may not be associated with a specific users' name, but the specificity of this information defines the individual in such detail that a name is unnecessary.[60]

80.     In other words, ID Bridging is dangerous because of the sheer expanse of information being compiled by companies like Defendant Pinterest without the knowledge or consent of users, all of which is being done for pecuniary gain.

### 3.     Email Addresses and Other Addressing Information

81.     Perhaps even more invasive than any other identifier, the Pinterest Tag's mass collection of email addresses from websites and apps represents a grave privacy violation. Pinterest admits that it discloses "information such as cookie IDs, your IP address, or a hashed version of your email address to third parties."[61]

82.     The logic of this is straightforward. If Pinterest collects the same e-mail address from two different site visits, it can determine with almost total accuracy that the sites are both being visited by the same person. The same is true of devices. If the same e-mail address is captured on two different devices, it is very likely those devices are used by the same individual.

83.     Although Defendant collects hashed SHA256[62] e-mail addresses, the reality is that "the match between your email and its hash is probably already

---

[60] GOOGLE'S SHADOW PROFILE: A DOSSIER OF CONSUMERS ONLINE AND REAL WORLD LIFE at 1 (Feb. 2019), https://tinyurl.com/2mtuh7vf.

[61] *Privacy Policy*, PINTEREST, https://policy.pinterest.com/en/privacy-policy (last updated Apr. 30, 2025)

[62] DEFINITION OF HASH, https://www.pcmag.com/encyclopedia/term/hash; *see also Automated Advanced Matching*, PINTEREST (last accessed Feb. 2026), https://business.Pinteresthelp.com/s/article/automated-advanced-matching

---

circulating widely and companies are marking money from it."[63]  Given the availability online of such "leaked" email/hashed email matches, entities are merely "pretend[ing]to protect your privacy"[64] through SHA-256 and/or other hashing algorithms.

84.    The Federal Trade Commission has warned companies for over a decade—including as recently as July 24, 2024—that hashing is an insufficient method of anonymizing information.[65]

85.    Thus, even in hashed form, email addresses are traceable to individuals.

86.    Location information functions in a similar manner.  If multiple websites or apps are visited from the same location, the pool of potential individuals who are accessing the website or app is narrowed considerably immediately and can be narrowed to a pinpoint over time.

87.    HTTP requests, when intercepted by Pinterest, collect device information that can also identify whether the same user is visiting multiple sites or apps, and can distinguish between the devices being used by a particular person. With every visit, and every subsequent HTTP request, the device information will be identical in each.

---

[63] PIXEL DE TRACKING, GUERLAIN (LVMH): LUXURY AND SURVEILLANCE, https://www-pixeldetracking-com.translate.goog/fr/votre-email-comme-vecteur-de-surveillance-ultime-illustration-avec-guerlain?_x_tr_sl=fr&_x_tr_tl=en&_x_tr_hl=en&_x_tr_pto=sc.

[64] *Id.*

[65] Ed Felten, *Does Hashing Make Data "Anonymous"?*, Federal Trade Commission (Apr. 22, 2012), https://www.ftc.gov/policy/advocacy-research/tech-at-ftc/2012/04/does-hashing-make-data-anonymous ("[H]ashing is vastly overrated as an 'anonymization' technique … the casual assumption that hashing is sufficient to anonymize data *is risky at best, and usually wrong.*") (emphasis added); *No, Hashing Still Doesn't Making Your Data Anonymous*, Federal Trade Commission (July 24, 2024) ("[H]ashes aren't 'anonymous' and can still be used to identify users, and their misuse can lead to harm. Companies should not act or claim as if hashing personal information renders it anonymized.").

**B.     Interception of Communications**

88.     The Pinterest Tag also intercepts millions of communications with websites and apps through the interception of full-string URLs.

89.     Pinterest, says it collects information when users use the Pinterest Services, such as collecting "which Pins you click on, terms you search for, boards you create, and any text that you add in a comment or description—along with other information you've provided when you first signed up and information from our partners and advertisers to make inferences about you and your preferences."[66]

90.     Additionally, Pinterest "may receive information about your visits to an advertiser's site, or purchases you made from them, or information about your interests from a third-party service, which we might use to help show you ads on the Service. Sometimes we get this information through the Pinterest Tag."[67] Upon information and belief, this implies that Pinterest, through and with its Advertising Partners' tags and tag manager solutions—including via the Pinterest Tag— are collecting the Universal Resource Locator (URL) of the webpages visited by each Pinterest Website and App user.

91.     Sometimes known as a "web address," the URL is the name of the webpage as displayed in the address bar of a browser.

92.     Each page on a website has its own individual URL, allowing tags with access to the URL to see which pages of a website a particular internet user visited.

93.     All URLs identify the pages of each page of a website an internet user visited.

---

[66] *Privacy Policy*, PINTEREST, https://policy.pinterest.com/en/privacy-policy (last updated Apr. 30, 2025)

[67] *Id.*

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED                    22

94. For example, when a user is entering a transaction on the Western union website, the transaction details are included in the URL:



{"loc":"https://www.westernunion.com/us/en/web/user/register?ReceiveCountry=AR&ISOCurrency=ARS&SendAmount=237&funds-out=DB&funds-in=AC","ref":"https://www.westernunion.com/us/en/home.html","if":false,"sh":1728,"sw":3072,"mh":"817db39b","is_eu":false,"epikDataSource":null,"derivedEpikDataSource":null,"unauthIdDataSource":"fpc","architecture":"x86","bitness":"64","brands":[{"brand":"Chromium","version":"142"},{"brand":"Google Chrome","version":"142"},{"brand":"Not_A Brand","version":"99"}],"mobile":false,"model":"","platform":"Windows","platformVersion":"19.0.0","uaFullVersion":"142.0.7444.176","ecm_enabled":true}
cb      1764857555976

95. As such, any tag that intercepts the URL on this page also intercepts details about the user's transaction. This process works similarly on other websites.

96. Pinterest, through its Advertising Partners' tags and tag manager solutions, and via the Pinterest Tag, collects the URLs and any information that can be gleaned or inferred from those URLs are added to the profiles that Pinterest has for that particular Website or App user.

## III. PINTEREST'S ADVERTISING PRODUCTS

97. Pinterest does not collect such a wide breadth of information for no reason, it uses the information it collects to target advertising on and off Pinterest.

### A. Pinterest Business

98. Pinterest Business is Pinterest's suite of advertising tools. It offers marketing solutions to advertisers, companies and brands who wish to advertise products or services on Pinterest's platform. The Pinterest Ads Manager is part of the Pinterest Business suite.

99. Pinterest advertises "targeting tools" as part of its Business platform.

100.   Pinterest's targeting allows Pinterest Business clients to "reach people by demographics, interests, keywords and more."[68] Users can implement multiple types of targeting, including: (1) audience targeting ("create audiences from your customer lists, people who've visited your site or people who have already interacted with your content on Pinterest"); (2) actalike audience targeting ("reach new people who behave similarly to one of your existing audiences"); (3) interest targeting ("select topics related to your ad to reach people with similar tastes"); (4) keyword targeting ("include or exclude keywords or phrases to target people as they search on Pinterest"); and (5) demographic targeting ("choose gender, age, location, language or device to refine your audience").[69]

101.   To engage in this targeting, advertisers can "upload existing customers' emails or mobile ad IDs (MAIDs) through a single-column CSV file." Pinterest Business clients can use "several different formats to upload your customer list," including "Email files: Cleartext, SHA256, MD5 hash key. Pinterest Business clients can also upload "MAID files: Cleartext, SHA1, SHA256, MD5 hash keys."[70]

102.   As part of Pinterest Business's "measurement solutions," Pinterest encourages advertisers to "[j]oin your first-party data with Pinterest data in a neutral, third-party environment." and "integrate Pinterest data with tools from other platforms."[71]

---

[68] *Your audience is here. And they're ready to shop.*, PINTEREST, https://business.pinterest.com/audience/ (last accessed Feb. 2026)

[69] *Review and select targeting options*, PINTEREST, https://help.pinterest.com/en/business/article/targeting-overview (last accessed Feb. 2026)

[69] *Id*.

[70] *Set up audience targeting*, PINTEREST, https://help.pinterest.com/en/business/article/audience-targeting (last accessed Feb. 2026).

[71] *Measure everything that matters,* PINTEREST, https://business.pinterest.com/analytics-and-measurement/#analyze (last accessed Feb. 2026)

---

103. In other words, Pinterest's ad targeting and measurement functionalities allow advertisers to essentially upload a set of data to Pinterest, which can then match, improve or further contextualize "profiles" on those advertisers' customers.

104. After Pinterest Business clients begin advertising on Pinterest, or integrate their customer data with Pinterest user data, Pinterest provides the Pinterest Analytics to measure their ad campaigns.[72]

105. Pinterest Analytics helps Pinterest Business users "understand your overall presence on Pinterest. It shows you what paid and organic published content resonates most on Pinterest."[73]

106. In other words, Pinterest compiles comprehensive data on its users through their interactions on the Website on in the App.  Pinterest then augments or matches the information of its end users with profile data provided by Pinterest Business clients to make that information more valuable to advertisers by aggregating that information into a consolidated profile, thereby driving advertisers' revenue.

**B.      Identity Resolution**

107. In addition to its own tracking of Website and App users across the internet, Pinterest engages in a process known as identity resolution – what it calls Advanced Matching. Advanced Matching can be an automatic process, or manually enabled by Pinterest Ads users.

108. Identity resolution is the technology marketing term for the process of data tracking described above. As Pinterest describes it: "Visitor retargeting identifies people who have already visited your site and lets you retarget them on

---

[72] *Id*.

[73] *Review Pinterest Analytics*, PINTEREST, https://help.pinterest.com/en/business/article/pinterest-analytics (last accessed Feb. 2026)

Pinterest… [or] [y]ou can upload existing customers' emails or mobile ad IDs (MAIDs)."[74]

109. In plain language, identity resolution is the culmination of Pinterest's and its Advertising Partners' tracking, where Pinterest matches an App or Website user to a larger record of their web and app activity for the purpose of targeted advertising.

110. Once sufficient data has been collected on an individual, Pinterest monetizes the individual's data in a number of ways. One way is to provide individuals' identities and web browsing information to its Advertising Partners to assist with those companies' serving targeted ads to internet users.

111. When an Advertising Partner implements the Pinterest Tag, the Pinterest Conversions API, or Pinterest cookies or technology on its website, Pinterest compiles the information of users interacting with an Advertising Partner's technology or trackers on that website. It then synthesizes that data with its data on its App users.

112. With respect to the delivery of targeted advertisements on websites and its own Website and App, Pinterest's audience targeting and matching of customers to Pinterest users makes the entire real-time-bidding process possible by identifying the individual visiting the site and providing information about their activity and interests. This creates the basis for hyper-targeted advertising related to that activity and those interests to be served. This ultimately benefits the website or app operator, as it makes their userbase more valuable because said users have been further identified and linked to other activity via the tags and tag manager solutions.

113. For these processes to happen, Pinterest must necessarily share the information it collects on individual internet users with its partners.

---

[74] *Set up audience targeting*, PINTEREST, https://help.pinterest.com/en/business/article/audience-targeting (last accessed Feb. 2026).

114. The identity resolution service aids in the wiretapping and surveillance conducted by the Advertising Partners.

**C.     Information Shared Outside of Pinterest's Ad Network**

115. Pinterest also enriches its detailed advertising profiles by exchanging information with independent advertising technology companies.

116. For example, Pinterest receives "segment" information, information about a which categories a particular person can be placed, from Permutive and advertising technology company specializing in data aggregation and sales.

117. This creates an additional privacy violation because the information shared by Pinterest with Permutive and similar entities is added to those entities' data profiles and is sold to other companies, disseminating the information far further than Pinterest's own advertising network.

118. An example of this process is demonstrated on the Bon Appetit website. The Pinterest Tag shares identifying information about the user with Permutive and Permutive responds with numerous "segments" where it has placed the user based on its own profile

```
200    GET    ct.pinterest.com
/v3/?tid=2614456676833&event=PermutiveSegmentEntry&ed[segment_id]="167591"
Wed Jan 21 13:19:46 EST 2026

200    GET    ct.pinterest.com
/v3/?tid=2614456676833&event=PermutiveSegmentEntry&ed[segment_id]="167592"
Wed Jan 21 13:19:46 EST 2026
```

\*        \*        \*

119. To summarize the proceeding allegations, Defendant deploys the Pinterest Tag on hundreds or thousands of websites to collect as much information about users as possible to create comprehensive user profiles. These profiles are

shared by Defendant with other entities (and vice versa) to compile as many details and attributes as possible. The profiles are offered up for sale to advertisers via Pinterest Ads, where they become increasingly more valuable as advertisers know more about the user. Thus, Defendant increases the price premium that advertisers are willing to pay because Defendant's ability to match users up to comprehensive profiles allows users to be identified and more directly targeted based on an assortment of identifiers and interests.

120. Accordingly, Defendant is using its Trackers in conjunction with website and mobile application operators and to (i) de-anonymize users, (ii) offer users up for sale for advertising, and (iii) allow website operators to maximum revenue by installing Defendant's Trackers and allowing the Defendant to collect as much information about users as possible without consent.[75]

121. Of course, Defendant also benefits from this arrangement because websites and apps will want to employ Defendant's services to bring in more advertising revenue, meaning Defendant can continue to expand and grow the information they have about any consumers and add to consumers' profiles, which further perpetuates the value of Defendant's services.

## IV. DEFENDANT'S TRACKERS ARE PRESENT ON EACH OF THE SUBJECT WEBSITES AND ACROSS THE INTERNET

122. As part of their investigation, Plaintiff's counsel found and conducted testing on several websites to provide a sample of the widespread tracking and wiretapping of, and targeted advertising to, millions of Americans by Defendant. For each of the websites tested, there are hundreds or thousands of others where the same or similar information is collected.

---

[75] Any purported "consent" obtained by third-party websites via cookie banners is invalid because those: (i) those often fail to honor the user's selected preference; (ii) fail to disclose data is being sent to a credit reporting agency for identity resolution; and (iii) Pinterest is a third party to that interaction, engaging in the recording or decoding of data it has no direct right to access.

---

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED                    28

123.    Thus, the conduct alleged in this Complaint is *not* limited to the specific websites alleged below.  Indeed, even Plaintiff himself visited other websites where Plaintiff's counsel found Pinterest would have tracked them.  Instead, these websites are merely examples of the types of data that Pinterest collects, and the ways in which it surveils users across the Internet.

A.    Zillow

124.    Zillow is an online real estate listing website, where website visitors can view properties to rent or buy and interact with landlords and real estate agents.

125.    Unbeknownst to website visitors, the Pinterest Tag is loaded onto each page of the Zillow website.

126.    The Pinterest Tag immediately loads tracking cookies onto the individual's browser in the manner described herein.

_pinterest_ct_ua
"TWc9PSZXVVFsMEdBRDBKMU11Ri94WXU4YlZmbzU2TG5PZnNaUHBsYldGRUN0eHBLM1owdThsZ3
JUQ2dlbzIvVWdBVnJRenF5TzE5OVlzSkMvWnZ3a1p4blgrMkxOYTYJiS3RVMlNzckt5TWtDSnY4Yz0mQ3J
keTdyOXZWZ3ZkMTJZVm1wbUJoNXplMmFFFPQ=="

127.    The Pinterest Tag also intercepts the detailed, full-string URL from each page of the Zillow website a user visits, as detailed above, thereby intercepting the user's communications with the website regarding which properties they are interested in.

{"loc":"https://www.zillow.com/homedetails/12250-SW-148th-Ter-Miami-FL-33186/44332381_zpid/","ref":"h
ttps://www.zillow.com/sell/","if":false,"sh":1728,"sw":3072,"mh":"7d8116bd","is_eu":false,"epikDataSource":
null,"derivedEpikDataSource":null,"unauthIdDataSource":"fpc_ls","architecture":"x86","bitness":"64","brand
s":[{"brand":"Google Chrome","version":"131"},{"brand":"Chromium","version":"131"},{"brand":"Not_A
Brand","version":"24"}],"mobile":false,"model":"","platform":"Windows","platformVersion":"15.0.0","uaFullVe
rsion":"131.0.6778.205","ecm_enabled":true}

128.    The Pinterest Tag also collects the user's browser and device information in the manner described herein (see the above image).

129.    Defendant then uses the information it collects to link the user to a de-anonymized profile and adds any new information to that profile. This profile is connected to the ID assigned to the individual, and to the individual's email address

and phone number, and added to Defendant's advertising products described herein. This data added to an individual's profile increases its value to advertisers—who can serve ads related to these keywords, sentiments, and information viewed—and Zillow—as its users are more valuable now that their information is being connected to Defendant's vast repository of information.

130. In addition, because of the setting of cookies and collecting of the user's device information, and email address, , Defendant tracks the future web activity of the individual and adds that information to its consumer profiles and tracking products, as well as connecting that information to users being offered up for sale to advertisers as part of the advertising process.

**B.  Western Union**

131. Western Union is a website where users can send money both domestically and internationally.

132. Unbeknownst to website visitors, the Pinterest Tag is loaded onto each page of the Western Union website.

133. The Pinterest Tag immediately loads tracking cookies onto the individual's browser in the manner described herein.

_pinterest_ct_ua
TWc9PSZ4bmxLSXoySzFQQUpudlc4Qkl3ZitUUHEvMkhOTEJNK05WR0VoQTY2Y2dOYkVQTlhha
mVEMTA3djJzeWhHTys5MHBPVk9hbEY2cENDNEgzQ2h3NzF2V3g5VmxrRXZUeExMQlJLLM2kvV
FRSdz0mTHM1aW1HcEtZQ0F3NkNrVjdGdGGNaRkVsQkhnPQ==

134. The Pinterest Tag also collects the user's browser and device information in the manner described herein.

d":"Chromium","version":"142"},{"brand":"Google Chrome","version":"142"},{"brand":"Not_A
Brand","version":"99"}],"mobile":false,"model":"","platform":"Windows","platformVersion":"19.0.0","ua
FullVersion":"142.0.7444.176","ecm_enabled":true}
cb      1764857555976

135. The Pinterest Tag also intercepts a hashed version of the user's email address as described herein.

```
Data:
pd      {"aem":"39184a70a40f90487662fa95308aa78643adac3d5e26fe478d6510bc716106b5"}
cb      1764857570719
dep     1,LISTENER_SCRAPE
```

136. The Pinterest Tag also intercepts full-string detailed URLs from the Western Union website. Notably, intercepting the URL means that Pinterest is intercepting the amount sent and the currency exchange requested.



137. Defendant then uses the information it collects to link the user to a de-anonymized profile and adds any new information to that profile. This profile is connected to the ID assigned to the individual, and to the individual's email address and phone number, and added to Defendant's advertising products described herein. This data added to an individual's profile increases its value to advertisers—who can serve ads related to these keywords, sentiments, and information viewed—and Western Union—as its users are more valuable now that their information is being connected to Defendant's vast repository of information.

138. In addition, because of the setting of cookies and collecting of the user's device information, and email address, Defendant tracks the future web activity of the individual and adds that information to its consumer profiles and tracking products, as well as connecting that information to users being offered up for sale to advertisers as part of the advertising process.

## V.   PLAINTIFF'S EXPERIENCE

139.   Plaintiff, while in California, visited at least 26 websites where Defendant's Pinterest Tag was present, including websites where Defendant is able to gather a wide variety of sensitive information on Plaintiff such as Zillow.com, WesternUnion.com, cvs.com, healthline.com, hrblock.com, and americanexpress.com.

140.   On each of these websites, the Pinterest Tag operated in the manner described above, setting cookies on Plaintiff Calcines's browser, so he can be identified on other websites, and intercepting his communications with the websites, and collecting identifying information such as his email address and device information.

141.   Defendant used the information collected by the Pinterest Tag to:

(a)   identity Plaintiff and either create a new profile of him or match him to a pre-existing profile;

(b)   enable each website and Partner to sell Plaintiff's information to advertisers for hyper-targeted advertising based on the information collected by the Pinterest Tag on the websites and the information contained on any profiles of Plaintiff (which are linked to Plaintiff via the information collected by Defendant on the websites);

(c)   enable the websites and advertising partners to target Plaintiff with advertisements and serve advertisements on Plaintiff based on the information collected and the information contained on any profiles of Plaintiff (which are linked to Plaintiff via the information collected by Defendant on the websites); and

(d)   de-anonymize Plaintiff and generate revenue from the sale of his information—both what is collected on the websites and the profiles this information is linked to—to advertisers, thus boosting the websites' revenue and the value of Defendant's services.

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED                    32

142. By using the cookies loaded onto Plaintiff Calcines's browser, Defendant also tracked his future web browsing activity across the internet and assisted other Partner Trackers in tracking him and wiretapping his communications with websites.

143. Plaintiff Calcines was unaware that Defendant was installing trackers on his browser, aiding in the wiretapping of his communications, deanonymizing his personal data, or collecting, selling, and disclosing his personal data, to advertising technology companies, other data brokers, or any person or entity doing business with Defendant. Nor could he have discovered these facts.

144. Plaintiff did not provide his prior consent to Defendant to install trackers on his browser, aid in the wiretapping of his communications, deanonymize his personal data, or collect, sell, and disclose his personal data, to advertising technology companies, other data brokers, or any person or entity doing business with Defendant. Nor did Defendant obtain a court order to do the same.

145. Plaintiff has, therefore, had his privacy invaded by Defendant's violations of the CIPA and ECPA, and Defendant has been unjustly enriched by enabling the disclosure and sale of the improperly collected data concerning Plaintiff Calcines.

## CLASS ALLEGATIONS

146. **Class Definition:** Plaintiff seeks to represent a class of similarly situated individuals defined as follows:

> All persons in the United States who visited a website or mobile application where the Pinterest Tag was present.

147. **California Subclass**: Plaintiff also seeks to represent a subclass of similarly situated individuals defined as follows:

> All California residents who visited a website or mobile application where the Pinterest Tag was present while in California.

148. The Class and California Subclass shall be collectively referred to as the "Classes," and Members of the Class and Subclass will collectively be referred to as "Class Members," unless it is necessary to differentiate them.

149. Excluded from the Classes are Defendant, any affiliate, parent, or subsidiary of any Defendant; any entity in which any Defendant has a controlling interest; any officer director, or employee of any Defendant; any successor or assign of any Defendant; anyone employed by counsel in this action; any judge to whom this case is assigned, his or her spouse and immediate family members; and members of the judge's staff.

150. **Numerosity**. Members of the Class are so numerous that joinder of all members would be unfeasible and not practicable. The exact number of Class Members is unknown to Plaintiff currently; however, it is estimated that there are tens or hundreds of millions of individuals in the Classes. The identity of such membership is readily ascertainable from Defendant's records and non-party records, such as those of Defendant's customers and advertising partners.

151. **Typicality**. Plaintiff's claims are typical of the claims of the Classes. Plaintiff, like all Class Members, had his information intercepted and made available for sale by Defendant using comprehensive user profiles compiled about Plaintiff.

152. **Adequacy**. Plaintiff is fully prepared to take all necessary steps to represent fairly and adequately the interests of the Classes. Plaintiff's interests are coincident with, and not antagonistic to, those of the members of the Classes. Plaintiff is represented by attorneys with experience in the prosecution of class action litigation generally and in the field of digital privacy litigation specifically. Plaintiff's attorneys are committed to vigorously prosecuting this action on behalf of the members of the Classes.

153. **Commonality/Predominance**. Questions of law and fact common to the members of the Classes predominate over questions that may affect only individual members because Defendant has acted on grounds generally applicable to the Classes. Such generally applicable conduct is inherent in Defendant's wrongful conduct. Questions of law and fact common to the Classes include:

    (a)    Whether Defendant's acts and practices alleged herein constitute egregious breaches of social norms;

    (b)    Whether Defendant acted intentionally in violating Plaintiff's and Class Members' privacy rights under the California Constitution or common law;

    (c)    Whether Defendant was unjustly enriched because of their violations of Plaintiff's and Class Members' privacy rights; and

    (d)    Whether Plaintiff and Class Members are entitled to damages under CIPA or any other relevant statute;

154. **Superiority**: Class action treatment is a superior method for the fair and efficient adjudication of the controversy. Such treatment will permit many similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, or expense that numerous individual actions would engender. The benefits of proceeding through the class mechanism, including providing injured persons or entities a method for obtaining redress on claims that could not practicably be pursued individually, substantially outweighs potential difficulties in management of this class action. Plaintiff knows of no special difficulty to that would be encountered by litigating this action that would preclude its maintenance as a class action.

## CAUSES OF ACTION
### COUNT I
**Intrusion Upon Seclusion**

155. Plaintiff repeats the allegations contained in the foregoing paragraphs as if fully set forth herein.

156. Plaintiff brings this claim individually and on behalf of the Classes against Defendant.

157. Plaintiff brings this claim pursuant to California law.

158. To state a claim for intrusion upon seclusion "[Plaintiff] must possess a legally protected privacy interest … [Plaintiff's] expectations of privacy must be reasonable … [and Plaintiff] must show that the intrusion is so serious in 'nature,

scope, and actual or potential impact as to constitute an egregious breach of the social norms." *Hernandez v. Hillsides, Inc*. 47 Cal. 4th 272, 286-87 (2009).

159. Plaintiff and Class Members have an interest in: (i) precluding the dissemination and/or misuse of their sensitive, confidential communications and information; and (ii) making personal decisions and/or conducting personal activities without observation, intrusion or interference, including, but not limited to, the right to visit and interact with various internet sites without being subjected to highly intrusive surveillance at every turn.

160. By conducting such widespread surveillance, Defendant intentionally invaded Plaintiff's and Class Members' privacy rights, as well as intruded upon Plaintiff's and Class Members' seclusion.

161. Plaintiff and Class Members had a reasonable expectation that their communications, identities, personal activities, and other data would remain confidential.

162. Plaintiff and Class Members did not and could not authorize Defendant to intercept data on every aspect of their lives and activities.

163. The conduct described herein is highly offensive to a reasonable person and constitutes an egregious breach of social norms, specifically including the following:

    a. Defendant engages in widespread data collection and interception of Plaintiff's and Class Members' internet and app activity, including their communications with websites and apps, thereby learning intimate details of their daily lives based on the massive amount of information collected about them.

    b. Defendant creates comprehensive profiles based on this online and offline data, which violates Plaintiff's and Class Members' common law right to privacy and the control of their personal information.

    c. Defendant sells or discloses improperly collected data about Plaintiff and Class Members, to an unknown number of advertisers for use in the

Defendant's advertising network which likewise violates Plaintiff's and Class Members' common law right to privacy and the control of their personal information.

164.   Defendant's amassment of electronic information reflecting all aspects of Plaintiff's and Class Members' lives into profiles for future or present use is in and of itself a violation of their right to privacy considering the serious risk these profiles pose to their autonomy.

165.   In addition, those profiles are and can be used to further invade Plaintiff's and Class Members' privacy by, for example, allowing third parties to learn intimate details of their lives and target them for advertising, political, and other purposes, as described herein, thereby harming them by selling this data to advertisers and other data brokers without their consent.

166.   Accordingly, Plaintiff and Class and California Subclass Members seek all relief available for invasion of privacy claims under common law.

**COUNT II**
**Violation Of The California Invasion of Privacy Act**
**Cal. Penal Code § 631(a)**

167.   Plaintiff repeats the allegations contained in the foregoing paragraphs as if fully set forth herein.

168.   Plaintiff brings this claim individually and on behalf of the California Subclass against Defendant.

169.   The California Legislature enacted the CIPA to protect certain privacy rights of California citizens.  The California Legislature expressly recognized that "the development of new devices and techniques for the purpose of eavesdropping upon private communications … has created a serious threat to the free exercise of personal liberties and cannot be tolerated in a free and civilized society."  Cal. Penal Code § 630.

170.   The California Supreme Court has repeatedly stated the "express objective" of CIPA is to "protect a person placing or receiving a call from a situation

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED                          37

where the person on the other end of the line *permits an outsider to tap his telephone or listen in on the call.*" *Ribas*, 38 Cal. 3d at 363 (emphasis added, internal quotations omitted). This restriction is based on the "substantial distinction … between the secondhand repetition of the contents of a conversation and *its simultaneous dissemination to an unannounced second auditor*, whether that auditor be a person or mechanical device." *Id*. at 361 (emphasis added). Such "simultaneous dissemination" "denies the speaker an important aspect of privacy of communication—the right to control the nature and extent of the firsthand dissemination of his statements." *Id*.; *see also Reporters Committee for Freedom of Press*, 489 U.S. at 763 ("[B]oth the common law and the literal understandings of privacy encompass the individual's control of information concerning his or her person.").

171. Further, "[t]hough written in terms of wiretapping, Section 631(a) applies to Internet communications." *Javier v. Assurance IQ, LLC*, 2022 WL 1744107, at \*1 (9th Cir. May 31, 2022). Indeed, "the California Supreme Court regularly reads statutes to apply to new technologies where such a reading would not conflict with the statutory scheme." *In re Google Inc.*, 2013 WL 5423918, at \*21 (N.D. Cal. Sep. 26, 2013). This accords with the fact that "the California Supreme Court has [] emphasized that all CIPA provisions are to be interpreted in light of the broad privacy-protecting statutory purposes of CIPA." *Javier*, 2022 WL 1744107, at \*2. "Thus, when faced with two possible interpretations of CIPA, the California Supreme Court has construed CIPA in accordance with the interpretation that provides the greatest privacy protection." *Matera v. Google Inc.*, 2016 WL 8200619, at \*19 (N.D. Cal. Aug. 12, 2016).

172. CIPA § 631(a) imposes liability for "distinct and mutually independent patterns of conduct." *Tavernetti v. Superior Ct.*, 22 Cal. 3d 187, 192-93 (1978). Thus, to establish liability under CIPA § 631(a), a plaintiff need only establish that the defendant, "by means of any machine, instrument, contrivance, or in any other manner," does any of the following:

Intentionally taps, or makes any unauthorized connection, whether physically, electrically, acoustically, inductively or otherwise, with any telegraph or telephone wire, line, cable, or instrument, including the wire, line, cable, or instrument of any internal telephonic communication system,

*Or*

Willfully and without the consent of all parties to the communication, or in any unauthorized manner, reads or attempts to read or learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line or cable or is being sent from or received at any place within this state,

*Or*

Uses, or attempts to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained,

*Or*

Aids, agrees with, employs, or conspires with any person or persons to unlawfully do, or permit, or cause to be done any of the acts or things mentioned above in this section.

173. To avoid liability under CIPA § 631(a), a defendant must show it had the consent of *all* parties to a communication, and that such consent was procured *prior to* the interception occurring. *See Javier*, 2022 WL 1744107, at *2.

174. Defendant's Trackers are each a "machine, instrument, contrivance, or … other manner" used to engage in the prohibited conduct at issue here.

175. Defendant is a "separate legal entity that offers [a] 'software-as-a-service' and not merely [] passive device[s]." *Saleh v. Nike, Inc.*, 562 F. Supp. 3d 503, 520 (C.D. Cal. 2021). Further, Defendant has the capability to use the wiretapped information for a purpose other than simply recording the communications and providing the communications to website operators. Accordingly, Defendant was a third party to any communication between Plaintiff and California Subclass Members, on the one hand, and any of the websites at issue, on the other. *Id*. at 521; *see also Javier v. Assurance IQ, LLC*, 649 F. Supp. 3d 891, 900 (N.D. Cal. 2023).

176.   At all relevant times, Defendant willfully and without the consent of all parties to the communication, and in an unauthorized manner, read, attempted to read, and learned the contents of the electronic communications of Plaintiff and California Subclass Members, on the one hand, and the websites at issue, on the other, while the electronic communications were in transit or were being sent from or received at any place within California.

177.   At all relevant times, Defendant uses those intercepted communications, including but not limited to building comprehensive user profiles that are offered for disclosure or sale to prospective advertisers.

178.   The Pinterest Tag is programmed so that each event functions the same way across websites. Each event is triggered simultaneously with the user's corresponding action on a website and any intercepted information is therefore intercepted in real time.

179.   Plaintiff and California Subclass Members did not provide their prior consent to Defendant's intentional interception, reading, learning, recording, collection, and usage of Plaintiff's and California Subclass Members' electronic communications.

180.   The wiretapping of Plaintiff and California Subclass Members occurred in California, where Plaintiff and California Subclass Members accessed the websites, where Defendant's Tracker was loaded on Plaintiff's and California Subclass Members' browsers, and where Defendant routed Plaintiff's and California Subclass Members' electronic communications to Defendant's servers.

181.   Pursuant to Cal. Penal Code § 637.2, Plaintiff and California Subclass Members have been injured by Defendant's violations of CIPA § 631(a), and each seeks statutory damages of $5,000 for each of Defendant's violations of CIPA § 631(a).

## COUNT III
### Violation Of The California Invasion Of Privacy Act, Cal. Penal Code § 632

182. Plaintiff repeats the allegations contained in the foregoing paragraphs as if fully set forth herein.

183. Plaintiff brings this claim individually and on behalf of the proposed California Subclass against Defendant.

184. Cal. Penal Code § 632 prohibits "intentionally and without the consent of all parties to a confidential communication," the "use[] [of] an electronic amplifying or recording device to eavesdrop upon or record the confidential communication."

185. Section 632 defines "confidential communication" as "any communication carried on in circumstances as may reasonably indicate that any party to the communication desires it to be confined to the parties thereto[.]"

186. Plaintiff's and Class members' communications to websites and mobile applications, including their sensitive personal and financial information, were confidential communications for purposes of § 632, because Plaintiff and Class Members had an objectively reasonable expectation of privacy in this data.

187. Plaintiff and Class Members expected their communications to be confined to the websites and mobile applications in part, due to the protected nature of the information at issue. Plaintiff and Class Members did not expect Defendant secretly eavesdrop upon or record this confidential information and their communications.

188. Defendant's tracking technology, i.e., the Pinterest Tag and Pinterest Cookies, are all electronic amplifying or recording devices for purposes of § 632.

189. By contemporaneously intercepting and recording Plaintiff's and Class Members' confidential communications to websites and mobile applications through this technology, Defendant eavesdropped and/or recorded confidential

communications through an electronic amplifying or recording device in violation of § 632 of CIPA.

190. At no time did Plaintiff or Class Members consent to Defendant's conduct, nor could they reasonably expect that such a vast swath of their online communications would be overheard or recorded by Defendant.

191. Defendant utilized Plaintiff's and Class Members' sensitive personal information for its own purposes, including for the construction of profiles and for targeted advertising.

192. Plaintiff and Class Members seek statutory damages in accordance with § 637.2(a) which provides for the greater of: (1) $5,000 per violation; or (2) three times the amount of damages sustained by Plaintiff and the Classes in an amount to be proven at trial, as well as injunctive or other equitable relief.

193. Plaintiff and Class Members have also suffered irreparable injury from these unauthorized acts. Plaintiff's and Class Members' sensitive data has been collected, viewed, accessed, stored, compiled, and widely sold and disseminated by Defendant, have not been destroyed, and due to the continuing threat of such injury, have no adequate remedy at law. Plaintiff and Class Members are accordingly entitled to injunctive relief.

## COUNT IV
### Violation Of The California Invasion Of Privacy Act, Cal. Penal Code § 638.51(a)

194. Plaintiff repeats the allegations contained in the foregoing paragraphs as if fully set forth herein.

195. Plaintiff brings this claim individually and on behalf of the proposed California Subclass against Defendant.

196. CIPA § 638.51(a) proscribes any "person" from "install[ing] or us[ing] a pen register or a trap and trace device without first obtaining a court order."

197. A "pen register" is a "a device or process that records or decodes dialing, routing, addressing, or signaling information transmitted by an instrument or facility from which a wire or electronic communication is transmitted, but not the contents of a communication." Cal. Penal Code § 638.50(b).

198. A "trap and trace device" is a "a device or process that captures the incoming electronic or other impulses that identify the originating number or other dialing, routing, addressing, or signaling information reasonably likely to identify the source of a wire or electronic communication, but not the contents of a communication." Cal. Penal Code § 638.50(c).

199. In plain English, a "pen register" is a "device or process" that records *outgoing* information, while a "trap and trace device" is a "device or process" that records *incoming* information.

200. For example, if a user sends an email, a "pen register" might record the email address it was sent from, because this is the user's *outgoing* information. On the other hand, if that same user receives an email, a "trap and trace device" might record the email address it was sent from, because this is *incoming* information that is being sent to that same user.

201. Historically, law enforcement used "pen registers" to record the numbers of outgoing calls from a particular telephone line, while law enforcement used "trap and trace devices" to record the numbers of incoming calls to that particular telephone line. As technology has advanced, however, courts have expanded the application of these surveillance devices. Indeed, Although CIPA was enacted before the dawn of the Internet, "the California Supreme Court regularly reads statutes to apply to new technologies where such a reading would not conflict with the statutory scheme." *In re Google Inc.*, 2013 WL 5423918, at *21 (N.D. Cal. Sep. 26, 2013).

202. Accordingly, courts have applied the CIPA to internet tracking technologies, including CIPA § 638.50, to trackers similar to those at issue here. *See, e.g., Deivaprakash v. Condé Nast Digital*, --- F. Supp. 3d ---, 2025 WL 2541952, at

*2-3 (N.D. Cal. Sept. 4, 2025) (finding tracker that collected IP address and device information was a "pen register" within the meaning of CIPA); *Fregosa v. Mashable, Inc.*, 2025 WL 2886399, at *1, *5-6 (N.D. Cal. Oct. 9, 2025) (same); *Shah v. Fandom, Inc*, 754 F. Supp. 3d 924, 930 (N.D. Cal. 2024) (same); *Mirmalek v. Los Angeles Times Communications LLC*, 2024 WL 5102709, at *3-4 (N.D. Cal. Dec. 12, 2024) (same); *Riganian v. LiveRamp Holdings, Inc.*, 2025 WL 2021802, at *11-12 (N.D. Cal. July 18, 2025) (same); *Scarlett v. Future US, LLC*, 2025 WL 2614587, *4-5 (San Francisco Cnty. Super. Ct. Sept. 5, 2025) (same); *Rose v. Variety Media, LLC*, 2025 WL 2794920, at *2-3 (Los Anges Cnty. Super. Ct. Sept. 24, 2025) (same); *Lesh v. Cable News Network, Inc.*, 767 F. Supp. 3d 33, 40-42 (S.D.N.Y. 2025) (Marrero, J.) (finding trackers similar to those here are "pen registers" under the CIPA); *Moody v. C2 Educ. Sys. Inc.*, 742 F. Supp. 3d 1072, 1076 (C.D. Cal. 2024) ("Plaintiff's allegations that the Pinterest Software is embedded in the Website and collects information from visitors plausibly fall within the scope of §§ 638.50 and 638.51."); *Greenley v. Kochava, Inc.*, 684 F. Supp. 3d 1024, 1050 (S.D. Cal. 2023) (referencing CIPA's "expansive language" when finding software was a "pen register");

203. The Pinterest Cookies installed on Plaintiff's and California Subclass Members' browsers are "pen registers" because they are "device[s] or process[es]" that "capture" the "routing, addressing, or signaling information"—the email addresses, IP address, geolocation, device information, and other persistent identifiers—from the electronic communications transmitted by Plaintiff's and California Subclass Members' computers or smartphones. Cal. Penal Code § 638.50(b).

204. The Pinterest Tags installed on the websites and apps are "pen registers" because they are "device[s] or process[es]" that "capture" the "routing, addressing, or signaling information"—the email addresses, IP address, geolocation, user mail addresses, and user phone numbers—from the electronic communications transmitted

by Plaintiff's and California Subclass Members' computers or smartphones. Cal. Penal Code § 638.50(b).

205. At all relevant times, Defendant used the Pinterest Tags and Cookies—which are pen registers—installed on Plaintiff's and California Subclass Members' browsers, which enabled Defendant to collect Plaintiff's and California Subclass Members' email addresses, IP addresses, geolocation, device information, email addresses, phone numbers, and other persistent identifiers from the websites and apps they visited. Defendant used the Trackers to build comprehensive user profiles, which were used to unjustly enrich Defendant and its clients by linking and enhancing Plaintiff's and California Subclass Members' data when it is provided to advertisers through Pinterest's Advertising tools.

206. Plaintiff and California Subclass Members did not provide their prior consent to Defendant's installation or use of the Pinterest Tag or any other tracking technology at issue.

207. Defendant did not obtain a court order to install or use the Pinterest Tag or any other tracking technology at issue.

208. Pursuant to Cal. Penal Code § 637.2, Plaintiff and California Subclass Members have been injured by Defendant's violations of CIPA § 638.51(a), and each seeks statutory damages of $5,000 for each of Defendant's violations of CIPA § 638.51(a).

**COUNT V**
**Violation of California's Unfair Competition Law**
**Cal. Bus. & Prof. Code § 17200, *et seq*.**

209. Plaintiff repeats the allegations contained in the foregoing paragraphs as if fully set forth herein.

210. Plaintiff brings this claim individually and on behalf of the Class against Defendant and on behalf of the California Subclass against Defendant.

211. In both cases, Plaintiff brings this claim pursuant to California law.

212. By committing the acts and practices alleged herein, namely surreptitiously surveilling on Plaintiff and Class Members and selling their information to numerous entities for advertising, Defendant violated California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code §§ 17200, *et seq.* as to Plaintiff and the Class, by engaging in unlawful and unfair conduct.

213. Defendant violated the UCL's proscription against engaging in **<u>unlawful business practices</u>** as a result of its violations of (1) the Electronic Communications Privacy Act, 18 U.S.C. §§ 2511(1); (2) the California Invasion of Privacy Act, Cal. Pen. Code §§ 631, 632, and 638.51; and (3) The California Constitution and common law.

214. Defendant's acts and practices described above also violate the UCL's proscription against engaging in **<u>unfair business practices.</u>** Defendant intentionally surveilled nearly every area of Plaintiff's and Class Members' lives, created permanent, non-anonymous profiles using that information, and sold that information to an unknown number of entities. Defendant's conduct is thus substantially injurious to consumers, offends public policy, and is immoral, unethical, oppressive and unscrupulous as the gravity of the conduct outweighs any alleged benefits.

215. Pursuant to California Business and Professional Code § 17203, Plaintiff and Class Members seek an order of this Court that includes, but is not limited to, requiring Defendant to: (a) provide restitution to Plaintiff and Class Members; (b) disgorge all profits obtained as a result of its violations of the UCL; and (c) pay Plaintiff's and the Class's attorneys' fees and costs.

216. To the extent Plaintiff does not have an adequate remedy at law, he pleads his claims under the UCL in the alternative to his legal claims. Legal remedies available to Plaintiff and Class Members are inadequate because they are not equally prompt and certain and in other ways as efficient as equitable relief. Damages are not as equally certain as restitution because the standard that governs restitution is different than the standard that governs damages. Hence, the Court may award

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED                                    46

restitution even if it determines that Plaintiff failed to sufficiently adduce evidence to support an award of damages. Damages and restitution are not the same amount. Equitable relief, including restitution, entitles Plaintiff to recover all profits from the wrongdoing, which may exceed the available damages at law.

### COUNT VI
### Violation of the Electronic Communications Privacy Act
### 18 U.S.C. §§ 2511(1), *et seq.*

217. Plaintiff repeats the allegations contained in the foregoing paragraphs as if fully set forth herein.

218. Plaintiff brings this claim individually and on behalf of the Class against Defendant and on behalf of the Class against Defendant.

219. The Electronic Communications Privacy Act ("ECPA") prohibits the intentional interception of the content of any electronic communication. 18 U.S.C. § 2511.

220. The ECPA protects both the sending and the receipt of communications.

221. 18 U.S.C. § 2520(a) provides a private right of action to any person whose wire or electronic communications are intercepted, disclosed, or intentionally used in violation of Chapter 119.

222. The transmission of Plaintiff's website page visits, selections, purchases and persistent identifiers to each website each qualify as a "communication" under the ECPA's definition of 18 U.S.C. § 2510(12).

223. The transmission of this information between Plaintiff and Class members and each website with which they chose to exchange communications are "transfer[s] of signs, signals, writing,…data, [and] intelligence of [some] nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic, or photo optical system that affects interstate commerce" and are therefore "electronic communications" within the meaning of 18 U.S.C. § 2510(12).

224. The ECPA defines "contents," when used with respect to electronic communications, to "include[] any information concerning the substance, purport, or meaning of that communication." 18 U.S.C. 18 U.S.C. § 2510(8).

225. The ECPA defines an interception as the "acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device." 18 U.S.C. § 2510(4).

226. The ECPA defines "electronic, mechanical, or other device," as "any device…which can be used to intercept a[n]…electronic communication." 18 U.S.C. § 2510(5).

227. The following instruments constitute "devices" within the meaning of the ECPA:

- The Pinterest Tag;

- Any other tracking code, API, or SDK used by Defendant;

- Each partner website and advertising partner;

- The plan Defendant carried out to effectuate the tracking and interception of Plaintiff's and Class Members' communications while they were using a web browser to navigate the Websites and Apps.

228. Plaintiff and Class Members' interactions with each website are electronic communications under the ECPA.

229. By utilizing the Pinterest Tag, as described herein, Defendant intentionally intercepted, endeavored to intercept, and/or procured another person to intercept, the electronic communications of Plaintiff and Class members in violation of 18 U.S.C. § 2511(1)(a).

230. Defendant intercepted communications that include, but are not limited to, communications to/from Plaintiff and Class members regarding their food and restaurant preferences, health concerns, real estate interests, consumption of media, geolocation, and many more. This confidential information is then added to consumer profiles and monetized for targeted advertising purposes, among other things.

231. By intentionally using, or endeavoring to use, the contents of Plaintiff's and Class Members' electronic communications, while knowing or having reason to know that the information was obtained through the interception of an electronic communication in violation of 18 U.S.C. § 2511(1)(a), Defendant violated 18 U.S.C. § 2511(1)(d).

232. Defendant intentionally intercepted the contents of Plaintiff's and Class Members' electronic communications for the purpose of committing a criminal or tortious act in violation of the Constitution or laws of the United States or of any state, namely, invasion of privacy, intrusion upon seclusion, CIPA, and other state wiretapping and data privacy laws, among others.

233. The party exception in 18 U.S.C. § 2511(2)(d) does not permit a party that intercepts or causes interception to escape liability if the communication is intercepted for the purpose of committing any tortious or criminal act in violation of the Constitution or laws of the United States or of any State. Here, as alleged above, "[t]he association of Plaintiff's data with preexisting user profiles is a further use of Plaintiff's data that satisfies [the crime-tort] exception," because it "violate[s] state law, including the [CIPA], intrusion upon seclusion, and invasion of privacy." *Brown v. Google, LLC*, 525 F. Supp. 3d 1049, 1067 (N.D. Cal. 2021); *see also Marden v.LMND Medical Group, Inc.*, 2024 WL 4448684, at *2 (N.D. Cal. July 3, 2024); *R.C. v. Walgreen Co.*, 733 F. Supp. 3d 876, 902 (C.D. Cal. 2024).

234. Defendant was not acting under the color of law to intercept Plaintiff's and Class members' wire or electronic communications.

235. Plaintiff and Class Members did not authorize Defendant to acquire the content of their communications for purposes of invading Plaintiff's and Class Members' privacy. Plaintiff and Class Members had a reasonable expectation that Defendant would not intercept their communications and sell their data to dozens of parties without their knowledge or consent.

236. The foregoing acts and omission therefore constitute numerous violations of 18 U.S.C. §§ 2511(1), *et seq*.

237. As a result of each and every violation thereof, on behalf of himself and the Class, Plaintiff seeks statutory damages of $10,000 or $100 per day for each violation of 18 U.S.C. §§ 2510, *et seq*.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on behalf of themselves and all Class Members, seek judgment against Defendant, as follows:

(a) For an order certifying the Classes pursuant to Fed. R. Civ. P. 23, naming Plaintiff as the representative of the Classes, and naming Plaintiff's attorneys as Class Counsel to represent the Classes.

(b) For an order finding in favor of Plaintiff and the Classes on all counts asserted herein;

(c) For compensatory, punitive, and statutory damages in amounts to be determined by the Court and/or jury;

(d) For pre- and post-judgment interest on all amounts awarded; and

(e) For an order awarding Plaintiff and the Class their reasonable attorneys' fees and expenses and costs of suit.

## JURY TRIAL DEMANDED

Plaintiff demands a trial by jury on all claims so triable.

Dated:  February 27, 2026

Respectfully submitted,

**BURSOR & FISHER, P.A**.

By: */s/ Philip L. Fraietta*
     Philip L. Fraietta

Philip L. Fraietta (State Bar No. 354768)
50 Main St., Ste. 475
White Plains, NY 10606
Telephone: (914) 874-0710
Facsimile: (914) 206-3656

E-mail: pfraietta@bursor.com

**BURSOR & FISHER, P.A.**
Joshua R. Wilner (State Bar No. 353949)
1990 North California Blvd., 9th Floor
Walnut Creek, CA 94596
Telephone: (925) 300-4455
Facsimile: (925) 407-2700
E-mail: jwilner@bursor.com

**BURSOR & FISHER, P.A.**
Max S. Roberts (State Bar No. 363482)
1330 Avenue of the Americas, 32nd Floor
New York, NY 10069
Telephone: (646) 837-7150
Facsimile: (212) 989-9163
E-mail: mroberts@bursor.com

*Attorneys for Plaintiff*